JOEL PAEZ in his individual capacity
and as the administrator for the Estate
of Manuel Esteban Paez Teran,
BELKIS TERAN,

      Plaintiffs,

 v.

RYAN LONG,
MARK LAMB, and
BRYLAND MYERS,

      Defendants.

Case No.:

1:24-cv-5780-SDG

## **AMENDED COMPLAINT**

Plaintiffs' child, Manuel Esteban Paez Teran, was part of a peaceful protest camping on public land when, on January 18, 2023, multiple law enforcement agencies raided their tent. Defendant Long planned the raid, targeting the Manuel Paez Teran and fellow protestors because of their political beliefs in violation of their First Amendment rights. Defendant Long also knew the protesters were camping on public land, and were not trespassing, but still instructed officers under his command to arrest everyone in the park for criminal trespass. Two of the arresting officers, Defendants Lamb and Myers, illegally seized Manuel Paez

Teran based on this order, and then used excessive force in response to Paez Teran's passive refusal to comply with their unlawful commands. The seizure and use of force violated the Fourth Amendment and proximately caused the death of Manuel Paez Teran.

Jurisdiction and Venue

1.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

2.      Plaintiffs bring this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of their deceased son's civil rights under the First, Fourth, and Fourteenth Amendments to the U.S. Constitution.

3.      Venue is proper in this district under 28 U.S.C. § 1391(b), this being the district where the claims arose.

Parties

4.      Plaintiff Belkis Teran is Manuel Esteban Paez Teran's mother and a holder of the wrongful death claim.

5.      Plaintiff Joel Paez is Manuel Esteban Paez Teran's father and a holder of the wrongful death claim. In November 2024, Mr. Paez was also appointed the administrator of Manual Paez Teran's estate.

6.      Defendant Ryan Long resides in the state of Georgia and is employed by the Georgia Bureau of Investigation. At all times material to the allegations

2

herein, Defendant Long was acting under color of state law. He is sued in his individual capacity.

7. Defendant Mark Lamb resides in Georgia and is employed by the Georgia State Patrol. At all times material to the allegations herein, Defendant Lamb was acting under color of state law. He is sued in his individual capacity.

8. Defendant Bryland Myers resides in Georgia and is employed by the Georgia State Patrol. At all times material to the allegations herein, Defendant Myers was acting under color of state law. He is sued in his individual capacity.

<u>Factual Allegations</u>

9. In September 2021, the Atlanta City Council authorized the lease of 381 acres of City-owned property in unincorporated DeKalb County.

10. The purpose of the lease was to have the Atlanta Police Foundation (APF) construct and maintain a new law enforcement training facility. That facility has been dubbed "Cop City."

11. The land leased to the APF encompassed partially wooded land, aptly named the South River Forest.

12. This land had a rich history, having once been the ancestral land of the Muskogee tribe, before becoming the W.B. Key plantation and later serving as an Atlanta prison dairy farm.

13.     Public opposition to the lease was extensive. For example, in September 2021, the Atlanta City Council received roughly seventeen hours of comments, the majority of which expressed opposition to building Cop City on these public lands. Opposition grew, as did the number of public comments in opposition, in subsequent City Council meetings.

14.     Opposition to the training facility brought together diverse community groups from neighboring community associations in East Atlanta, Grant Park, Kirkwood, and the neighborhoods represented in the South Atlantans for Neighborhood Development, with environmental and racial justice organizations, such as the South River Watershed Alliance, Community Movement Builders, the Georgia and Metro Atlanta chapters of the Sierra Club, Black Alliance for Peace, the Atlanta Sunrise Movement, the Center for Constitutional Rights, Beacon Hill Black Alliance for Peace, and many more.

15.     Some opposed to the training center held an ongoing occupation-style protest and education campaign against Cop City in Intrenchment Creek Park, a neighboring public park owned by DeKalb County.

16.     Unless otherwise specified, all allegations in this complaint pertain to the date of January 18, 2023, after the time of 7:00 a.m.

17.     On January 18, 2023, Manuel Paez Teran was seized by police while camping in Intrenchment Creek Park. The seizure included, among other things,

being shot and killed by police while camping in Intrenchment Creek Park. Paez Teran was seized due to expressing, by word and action, opposition to the construction of Cop City.

18. Paez Teran was targeted for police action and seizure due to the content of his speech and his viewpoint critical of Cop City.

19. Had Paez Teran been sleeping in Intrenchment Creek Park without exercising speech critical of Cop City, he would not have been subject to force on January 18, 2023 after 7:00 a.m.

20. Intrenchment Creek Park is owned by DeKalb County.

21. Intrenchment Creek Park is not owned, leased, or controlled by the City of Atlanta.

22. Intrenchment Creek Park is not the location of the police training center.

23. Before January 18, 2023, Intrenchment Creek Park hosted numerous First Amendment activities, the majority of which were held by individuals who were opposed to the construction of the police training center.

24. Intrenchment Creek Park served as a gathering and community meeting area for many who opposed the construction of Cop City. Individuals would use the park to hold meetings, concerts, workshops, teach-ins, guided hikes,

5

communal dinners, arts and music festivals, celebrations, potlucks, and press conferences.

25. In addition, Intrenchment Creek Park had paved and unpaved trails used by the public for outdoor recreation.

26. Even after January 18, 2023, Intrenchment Creek Park continued to be used as a venue for artistic expression, political speech, and political gatherings.

27. As of January 18, 2023, the property on which Manual was camping was public land and open for public use.

28. Indeed, other people long camped at Intrenchment Creek Park without being arrested or subject to violent shows of police force unless they had been suspected of committing some crime.

29. As of January 18, 2023, there was no federal, state, local, or municipal law that prohibited camping inside Intrenchment Creek Park.

30. Intrenchment Creek runs between Intrenchment Creek Park and the training center property and serves as a natural border between the two properties.

31.     The following image shows the location of Intrenchment Creek. The area outlined in red is owned by DeKalb County and referred to as Intrenchment Creek Park. The City of Atlanta property, which is the site of the police training center, is located to the west of Intrenchment Creek on the west side of a power line easement running diagonally from the northwest to southeast of the property.



32.     Intrenchment Creek Park was not closed to the public until March 24, 2023, after the Chief Executive Officer of DeKalb County issued executive order 2023-001.

33.     On and before January 18, 2023, there were no signs indicating that area was off limits or warned that camping would amount to trespassing, or that the public area was subject to any restriction on the time of its use.

34.     Manuel's presence and encampment in Intrenchment Creek Park was an act of protest to the construction of the police training center and designed to

further the political message of those who opposed the construction of the police training center.

35.     The issues of whether the police training center should be constructed, and, if so, its location, are core political questions and speech addressing those issues is core political speech.

Count I

36.     This count is brought by Joel Paez as the administrator of the Estate of Manuel Paez Teran against Defendants Long, Lamb, and Myers for false arrest in violation of the Fourth Amendment of the United States Constitution.

37.     On the morning of the operation to clear Intrenchment Creek Park, Defendant Long issued a directive to the law enforcement personnel clearing the forest that any person found in Intrenchment Creek Park should be arrested immediately.

38.     Prior to that morning's operation, no Defendant was informed that they had the authority to issue criminal trespass warnings to bar individuals from Intrenchment Creek Park.

39.     Defendant Long had both visited Intrenchment Creek Park prior to the raid and knew that the area were protestors camped was owned by DeKalb County, and not part of the City of Atlanta's proposed training center.

40. Neither the GBI nor the City of Atlanta had the authority to exclude any person from Intrenchment Creek Park.

41. While camping in Intrenchment Creek Park, Manuel was not on property owned by the City of Atlanta.

42. During the operation to clear the forest, six officers and one police dog approached Manuel's tent, who had been sleeping inside the tent.

43. Six officers—including Defendants Myers and Lamb—had their guns drawn and surrounded the tent.

44. The officers surrounding the tent announced that Manuel was going to be placed under arrest for criminal trespass.

45. The officers surrounding the tent did not inform Manuel that they were acting on behalf of any person with lawful authority to exclude individuals from the public park.

46. Even if they had authority to exclude Manuel from Intrenchment Creek Park, Defendants Long and Myers did not give Manuel adequate time to depart before announcing that Manuel was under arrest.

## Count II

47. This count is brought by Joel Paez as the administrator of the Estate of Manuel Paez Teran against Defendants Lamb and Myers for excessive force in violation of the Fourth Amendment of the United States Constitution.

48. Though he was not committing any crime police officers seized Manuel Paez Teran through a show of authority. [can we add facts about it being a ton of officers, saying lots of things, all with all sorts of weapons?]. In addition, and by way of further example, officers stated that if Manuel did not exit the tent and comply with their commands, they would shoot him a chemical agent.

49. The officers did not warn Manuel that the chemical agent would be fired from a gun.

50. Officers claimed Manuel was being seized for an act of criminal trespass.

51. These claims were false, both because: (1) Manuel was not trespassing, (and there was no probable cause to believe he had engaged in criminal trespass), and (2) because they were a lie as the officers targeted Manuel due to the content of his speech in opposing the construction of Cop City.

52. The officers did not have a warrant for Manuel's arrest; they did not claim they had a warrant to arrest him; and they did not offer to show Manuel an arrest warrant they did not have.

53. Manuel did not exit the tent to be face-to-face with a barrage of armed officers in riot gear.

54. Manuel did not threaten the officers.

55. Manuel's voice was calm when interacting with the officers.

56. No officer observed Manuel with a weapon.

57. Manuel did not say or do anything that would have made any reasonable office believe that he posed a threat to himself or others.

58. Manuel did not pose any threat to the safety of the officers or others. He was in a tent, peacefully protesting, and had just woken up.

59. Nonetheless, Defendant Myers fired exploding peppers balls into Manuel's tent.

60. Defendant Lamb ordered Defendant Myers to fire pepper balls into Manuel's tent.

61. Though the police sometimes refer to pepper balls as "non-lethal" firing chemical agents at people via rifles can case serious bodily harm, and even death.

62. The pepper balls fired by Defendant Myers are small balls filled with a synthetic form of oleoresin capsicum and which are fired from a specialized weapon. A picture of the weapon is below.



63. Defendant Myers fired several pepper balls rounds into Manuel's tent.

64. Defendant Myers specifically aimed and fired the pepper balls into, rather than around or outside of, Manuel's tent.

65. The pepper balls hit inside Manuel's tent, filling the tent with a chemical which immediately makes it difficult to breathe, and causes painful and debilitating pain to the eyes, mouth, nose, and lungs.

66. The pepper balls cause immediate involuntary closing of the eyes and excessive tearing and significantly impair the ability to breathe.

67. The effect of shooting pepper balls into an enclosed area like a tent would immediately make it impossible for the person inside to see or breathe.

68. Any person trapped inside a tent that is filled with oleoresin capsicum would reasonably believe that they were going to die.

69. At the time Defendant Myers shot pepper balls into Manuel's tent, Manuel had not engaged in any crime.

70. Nor was there probable cause to believe Manuel had committed a crime, let alone a crime involving the threat of death or serious injury to anyone.

71. This count is brought by Joel Paez as the administrator of the Estate of Manuel Paez Teran against Defendant Long for retaliation in violation of the First Amendment of the United States Constitution.

72. Manuel's participation in the activities in Intrenchment Creek Park, including camping in the park, constituted core political speech.

73. The operation to clear Intrenchment Creek Park followed from a months-long effort by state and local law enforcement agencies to portray those opposed to the construction of the police training center as domestic terrorists.

74. Defendant Long acted in concert with these law enforcement groups and officials. These officials include the City of Atlanta Chief of Police, the Director of the GBI, and other elected officials and law enforcement leaders.

75. The purpose of the raid and Defendant Long's order to arrest everyone in Intrenchment Creek Park was to end the ongoing protest against the training center.

76. Prior to the raid, the GBI falsely claimed that the United States Department of Homeland Security (DHS) had designated the individuals associated with "Defend the Atlanta Forest" as domestic violent extremists. In reality, DHS does not designate U.S. entities as "domestic terrorists" or "domestic

violent extremists." That statement was a misrepresentation of the position of the United States government at the time.

77. Moreover, "Defend the Atlanta Forest" is not a cognizable group. It has no membership, no leadership, and no structure. Law enforcement defined persons as members of "Defend the Atlanta Forest" based solely on that person's political beliefs and overall opposition to the construction of the police training center.

78. On December 15, 2022, the assistant police chief of the City of Atlanta publicly stated that all out-of-state protesters should be deemed "terrorists," and urged community leaders to promote a narrative that all persons opposed to the construction of the police training center were domestic terrorists.

79. Throughout the protests, the state and local law enforcement agencies claimed those who hold certain political beliefs or who attend a protest against the police training center were members of a group called "Defend the Atlanta Forest."

80. On December 13, 2022, Owen Ramsby was arrested by City of Atlanta police officers because he was filming police near the training center. Police falsely claimed that Mr. Ramsby was a member of an extremist group.

81. On July 22, 2022, Atlanta-Journal Constitution photographer Ben Hendren was arrested by Georgia State University police while taking photos of protesters who were accused of trespass and vandalism. Atlanta Police Department

Investigator Ronald Sluss falsely claimed that Mr. Hendren was a member of the Defend the Forest and Stop Cop City "movements." Mr. Hendren's lawsuit against the arresting officers is currently pending.

82. On June 15, 2022, City of Atlanta police, along with other law enforcement agencies, arrested Michael Watchulonis, a journalist and documentary filmmaker. The sole basis for Mr. Watchulonis' arrest was that he was present in Intrenchment Creek Park. At the time of Mr. Watchulonis' arrest, the park was open to the public and there were no posted no trespassing signs. Mr. Watchulonis' lawsuit against the arresting officers is currently pending.

83. On the morning of January 18, 2023, Defendant Long did not know or have any specific facts that would lead them to believe that Manuel had participated in any of the alleged criminal activity.

84. Prior to January 18, 2023, the alleged crimes that authorities attributed to those who opposed the construction of the training center centered around property crimes. No individuals were injured. Those prior criminal actions were not carried out inside Intrenchment Creek Park, and there was no basis to believe that any specific person inside Intrenchment Creek Park was involved, directly or indirectly, with any previous criminal act.

85. The above-referenced crimes were not carried out on behalf of any identifiable group, and those criminal actions were wholly separate from the

15

peaceful and lawful opposition to the construction of the training center and the ongoing use of Intrenchment Creek Park to engage in core political speech.

<u>Count IV</u>

86. This count is brought by Joel Paez and Belkis Teran for the wrongful death of Manuel Paez Teran. This count incorporates all previous factual allegations.

87. The following allegations are primarily based upon public statements made by the Georgia Bureau of Investigation following the death of Manuel Paez Teran. Although the Georgia Bureau of Investigation was involved in the planning an execution of the raid that is the subject of this lawsuit, it did not request an independent investigation and instead its own personnel conducted the investigation of the death of Manuel Paez Teran.

88. According to the Georgia Bureau of Investigation, Manuel Paez Teran possessed a firearm inside the tent in which Paez was seated at the time of the encounter with Defendants.

89. Based on being surrounded by a group of men in militarized outfits each holding assault rifles, being informed of an illegal arrest, the sound of the gun used to fire the pepper balls into the tent, impaired decision-making arising from the tent filling with toxic gas, Manuel panicked and believed that Defendants were in the process of using deadly force.

16

90. According to the Georgia Bureau of Investigation, Manuel fired several bullets from inside the tent.

91. Manuel did not have a clear view of the officers surrounding the tent and did not intentionally shoot any of the officers. Manuel's reaction of firing from the tent was based solely on the preceding false arrest and subsequent use of force to effectuate that arrest.

92. According to the Georgia Bureau of Investigation, one of the officers surrounding the tent was hit by one of the bullets fired from inside the tent.

93. After Manuel fired bullets from inside the tent, as claimed by the Georgia Bureau of Investigation, Defendants Myers and Lamb, along with several other officers returned fire. As a result, Manuel was shot over twenty times, dying from a bullet to the head.

<u>Prayer for Relief</u>

Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants on all counts and award against each Defendant:

A. compensatory damages;

B. punitive damages;

C. attorney's fees under 42 U.S.C. § 1988;

D. court costs; and

E. all other relief at law or in equity to which Plaintiffs are legally entitled.

<u>Jury Demand</u>

Plaintiffs demand a trial by jury pursuant to Rule 38(b) on all issues so triable.

Dated: April 24, 2025

Respectfully submitted,

**Jeff Filipovits**
Jeff Filipovits
Georgia Bar No. 825553

**Wingo F. Smith**
Wingo F. Smith
Georgia Bar No. 147896

**G. Brian Spears**
G. Brian Spears
Georgia Bar No. 670112

**David B. Owens**
David B. Owens

SPEARS & FILIPOVITS, LLC
315 W. Ponce de Leon Ave., Ste. 865
Decatur, Georgia 30030
404.905.2225
jeff@civil-rights.law
wingo@civil-rights.law
bspears@civil-rights.law

LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
312.243.5900
david@loevy.com